(C.D. 2066)

ELL RON DISTRIBUTORS *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 16, 1959)

*Robert Barko* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: Plaintiff herein has protested the action of the collectors of customs at the ports of Tampa and New York in classifying certain imported gypsum board, invoiced as "Gyplath," as cardboard or paperboard, laminated by means of an adhesive substance, and in assessing duty thereon at the rate of 15 per centum

ad valorem, within the provisions of paragraph 1413 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802. Four importations of this merchandise are here involved, and three protests which have been consolidated for the purposes of trial, relate to them.

Primarily it is the contention of plaintiff, as expressed in said protests, that the merchandise in issue is properly dutiable at the rate of 5 per centum ad valorem, pursuant to the provisions of paragraph 1402 of said act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, for wallboard, not laminated by means of an adhesive substance, or otherwise subjected to any of the processes enumerated in said paragraph.

The language of the competing provisions, insofar as here pertinent, reads as follows:

Paragraph 1413, as modified by T.D. 51802, *supra*:

Paper board and pulpboard, including cardboard and leatherboard or compress leather, plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, or decorated or ornamented in any manner:

| * | * | * | * | * | * | * |

Other _____ $7.25 per ton of 2000 lb., but not less than 7½% nor more than 15% ad val.

Paragraph 1402, as modified by T.D. 52373 and T.D. 52462, *supra*:

Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:

Wallboard and wet-machine board other than beer mat board _____ 5% ad val.

During the course of trial, counsel for the Government conceded the inapplicability of any of the foregoing processes, except those of lamination by means of an adhesive substance, and/or coating, and/or lining or vat-lining; and that the collectors' classification of the instant merchandise was either as paperboard or cardboard. However, the issue seems further to have been limited in the brief of Government counsel to the question of whether the involved board is paperboard

or cardboard, laminated by means of an adhesive substance, or wallboard, not laminated by means of an adhesive substance. And since counsel does not urge that the collectors' classification rests on these other factors, we are not disposed to consider them here.

It was further stipulated by respective counsel that:

* * * the imported merchandise in this case belongs to that class or kind of wallboard which was at and immediately prior to the passage of the Tariff Act of 1930 or at and prior to the effective date of the Trade Agreement under which it was classified, chiefly used as wallboard.

Accordingly, it is apparent that the only question here is whether or not the instant gypsum wallboard has been laminated by means of an adhesive substance.

In support of the contention that it has not, plaintiff introduced the testimony of three witnesses together with several documentary exhibits. No evidence was presented on behalf of the defendant. Inasmuch as the witness, Karl Zahler, was not shown to have any familiarity with gypsum wallboard, other than the fact that his company had purchased approximately one million feet of the product, his testimony is without evidentiary value.

Nat Rockmore, the first witness, testified that, for the past 30 years, he has been in the foreign freight forwarding business, as president of the Imperial Forwarding Co., and has also, at various times, imported for his own account. The merchandise at bar, consisting of some 750,000 square feet of gypsum wallboard, was imported by him under the name of Ell Ron Distributors. He also imported approximately a million feet of gypsum wallboard, not here involved. The subject board was manufactured by and purchased from Gypsum Industries, Ltd., of Dublin, Ireland.

This witness had no personal knowledge of the manufacturing processes of Gypsum Industries, Ltd., but has seen similar board manufactured by a domestic company in Rockland County, and, by virtue of having been engaged in a "very large building operation" during the 1920's in which a couple of million feet of gypsum wallboard of American manufacture were consumed, appeared to have a reasonable degree of familiarity with this type of product.

He described gypsum wallboard as a "rock plaster ground and put through a certain wetting process, rolled to the particular sizes that are used in the trade, and encased in this heavy manila paper," as represented by plaintiff's exhibit 7, a domestic board, and plaintiff's exhibit 8, a board produced by Gypsum Industries, Ltd., and sold to the Ferro Union Corp. of New York City.

It was the opinion of this witness, predicated solely upon his experience in handling gypsum wallboard of the type represented by said exhibits, and admittedly no expert on the subject, that this product was not laminated, because it is not made of two or more

layers held together with an adhesive. He explained that the paper on either side of the gypsum core adheres thereto for the reason that "in the grinding of the gypsum and in the wetting process there seems to be an automatic adherence of the paper to the gypsum, and automatically dries and becomes one piece." He further stated that the paper, which is a heavy manila paper, is used to prevent the plaster from breaking in handling.

Plaintiff's witness Joseph P. Nugent is the vice president of United States Wallboard Machinery Co., a firm engaged in the design, sale, and installation, in foreign countries, of individual machines and whole plants for the manufacturing of various types of wallboard. He is a graduate engineer, holding a degree from the University of Notre Dame. In 1946, as a supervisory engineer for the company, he was assigned to supervise the erection of the plant of Gypsum Industries, Ltd., and, during the 14-month period he was engaged in that operation, the plant was completed and had produced several hundred thousand square feet of the material in a 24-hour run. This witness had also personally supervised the construction of wallboard manufacturing plants in Chile and in South Africa. As a result, he was familiar with the manufacture of wallboard, such as exhibit 8, which process he described as follows:

Gypsum board, including gypsum lath is actually made by moulding a mixture of plaster—gypsum plaster in a state after you have added water to dry gypsum plaster, moulding it between layers.

\* \* \* \* \* \* \*

\* \* \* You find gypsum in its natural state; calcium, you crush it and you drive off one and a half molecules of water. The resultant product is known as gypsum plaster or more commonly as plaster of Paris. When you add water back to the gypsum, calcine gypsum, it takes back the water of the combination and reverts back to a rock form. When it is in the liquid state after you have added water to it and if you mould it between two layers of paper, then you make gypsum wallboard and gypsum lath or sheeting, which are generally termed as gypsum wallboard.

Nugent was also of opinion that this wall board was not laminated by means of an adhesive substance, as he understands the word "laminated." He stated that the paper adheres to the plaster as the plaster dries, although there is a small amount of starch in the fluid plaster which helps to increase the bond. "In other words, you don't make your plaster first and then put the paper on top of it. The plaster is in a mixed or plaster state and the way the board is made, you have your bottom paper, you drop the plaster on to the bottom paper and it passes between the forming roll which determines your thickness. It is formed in a continuous sheet but there is no laminating done as I understood the word laminating. It is a moulded product."

We do not believe that either of these witnesses was sufficiently qualified to state whether or not the merchandise in issue was laminated by means of an adhesive substance, but we do not consider it material that they were not. The language in question is statutory, and, in the absence of commercial designation, which is not claimed here, calls for judicial interpretation of its meaning. Expressions of opinion on the part of witnesses, even when qualified, are at most advisory. They may be considered as an aid to construction, to refresh the memory of the court, to throw light upon obscure or doubtful passages, but they are not essential, and may, if the court be so disposed, be entirely disregarded. "The court is not bound by the testimony of witnesses relating to the common meaning of terms." *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C.C.P.A. (Customs) 24, C.A.D. 209.

We look to the evidence in this case for a description of the method of manufacture of the instant gypsum wallboard to ascertain, if possible, whether that process comports with our judicial understanding of the meaning of the phrase, "laminated by means of an adhesive substance." It is our view that the witnesses Rockmore and Nugent, especially the latter, who had installed the equipment for the foreign manufacturer of the instant merchandise, were qualified for that purpose. The evidence which they gave, in this connection, establishes that gypsum board of the type here involved is made by adding water and a small amount of starch to dry gypsum plaster, and molding the fluid plaster between sheets of heavy paper.

The collectors' classification of imported merchandise is presumptively correct and carries with it the implication that all facts necessary to sustain it have been affirmatively found. *McKesson & Robbins, Inc.* v. *United States*, 27 C.C.P.A. (Customs) 157, C.A.D. 77; *E. I. du Pont de Nemours & Co.* v. *United States*, 27 C.C.P.A. (Customs) 146, C.A.D. 75. The burden rests with the party challenging it to rebut all essential findings, as well as to sustain the validity of the claimed alternative classification. *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C.C.P.A. (Customs) 150, C.A.D. 227; *United States* v. *Enrique C. Lineiro*, 37 C.C.P.A. (Customs) 5, C.A.D. 410. As applied to the merchandise at bar, the collectors having invoked the provisions of paragraph 1413, as modified, *supra*, it must be presumed that it is paperboard or cardboard, laminated by means of an adhesive substance, and it was incumbent upon the plaintiff to prove otherwise.

It is to be noted that paragraph 1413 contains no *per se* enumeration of wallboard, and that the only provision for that product is the unprocessed variety included within paragraph 1402, *supra*, which so far as here concerns us, is for wallboard, not laminated by means of an adhesive substance. If the product at bar has been laminated by

means of an adhesive substance, it is excluded from the scope of paragraph 1402, even though it has been stipulated to be merchandise of a kind chiefly used as wallboard.

In the case of *United States* v. *O. M. Baxter*, 16 Ct. Cust. Appls. 257, T.D. 42868, certain "Pyramid Wall board," composed of wooden slats cemented together, and covered on both sides by layers of cement, upon which were superimposed thin layers of paper or pulp, was held to be laminated and, therefore, excluded from the provision for wallboard, not laminated, in paragraph 1302 of the Tariff Act of 1922. The court found, in accordance with dictionary definitions, that the term "laminated" meant arranged in layers and that the layers or laminae did not need to be of only one kind of material, or put together for any specific purpose. Since the "Pyramid Wall board" was composed of layers of cement and paper over a layer of wood, it was held to be laminated and, therefore, excluded from said paragraph 1302.

The provision for wallboard in the Tariff Act of 1930, and as modified, differs from the 1922 provision in that the latter reads "wallboard * * * not laminated," whereas the present provision is for "wallboard * * * not * * * laminated by means of an adhesive substance." But it is not our view that in effecting the change in language Congress intended to modify the rule of the cited case so far as the instant merchandise is concerned. The intention of Congress with respect to the new language is set forth in Report No. 37 of the Committee on Finance of the Senate, dated September 3, 1929, to accompany H.R. 2667, which eventually became the Tariff Act of 1930. It is therein stated:

Laminated board as known in the industry consists of two or more layers of board combined with an adhesive substance. Board composed of layers which have been united or combined by pressure on a multicylinder machine in one process without the use of an adhesive substance is known in the trade as unlaminated board. The term "laminated by means of an adhesive substance" which is substituted for "laminated or pasted" in the House bill is here used to indicate a board produced as a secondary process by combining two or more layers with the employment of an adhesive substance.

The evidence introduced by plaintiff reveals that, in the production of gypsum board, fluid plaster is molded into a sheet or board between layers of paper, and the paper adheres to the mass by reason of the natural bonding capacity of the plaster. In addition, a small quantity of starch is added to increase the bond. In other words, two layers of paper, having a preexistence in a form which the collector has found to be paperboard or cardboard, and the evidence does not show to be otherwise, are held together by means of a substance having an inherent adhesive quality. It is not material that the gypsum core does not become a layer until the fluid plaster passes between the

forming roll, since the plaster itself serves as the adhesive which holds together the overlayers of heavy paper. In this structure there is lamination within the meaning of the term as defined in *United States* v. *Baxter, supra,* and within the intent of the legislature, and it is of no significance that the thickness of the core exceeds that of the thickness of the cardboard layers.

Although the witness Rockmore testified that the paper is used for the purpose of preventing breakage in handling the board, some of the documentary exhibits offered on behalf of the plaintiff, including the manufacturer's catalog, plaintiff's exhibit 6, reveal that the paperboard facing performs an important function in the use of the product as a wallboard, since it is "particularly suitable for most forms of decoration." Moreover, the record is devoid of competent proof showing either that the layers of paper are inconsequential, or that gypsum (plaster of paris) is the component material of chief value of the importation.

Based upon the foregoing considerations, we find and hold that plaintiff has failed to overcome the presumption of correctness of the collectors' classification of the merchandise at bar as paperboard or cardboard, laminated by means of an adhesive substance, as provided for in paragraph 1413, as modified, *supra.* All claims in the protests are, therefore, overruled.

Judgment will be entered accordingly.